Good morning. May it please the Court, Presiding Judge Lee, fellow Justices, my name is Ryan Janis. I represent the defendants and the appellants, Fitness Elite, as well as Dan Mauger and Brooke Mauger, who are both with me in the courtroom today. I would like to reserve three minutes for rebuttal. Just to start off, and I know the Court is well aware of this, this entire controversy revolves around, well, it was competing breach of contract claims revolving around the head coach employment agreement of Ivan Ivanov with Fitness Elite. This case went to trial, it was well briefed, but what is not disputed at any point during any of this is that the agreement governed, the parties do not dispute that the agreement was signed and that they agreed to the terms in it. This is important because the District Court below, on at least three separate occasions, these are really the three issues I'd like to focus on today, effectively rewrote the contract for the parties. First off, in determining what was, well, two separate liquidated damages provisions, effectively rewrote them to be severance pay provisions, despite the word severance not appearing anywhere within the contract. And this is despite the fact that within the provision that Mr. Ivanov relies on, the liquidated damages provision, it states liquidated damages on two separate occasions, and despite the fact that in the following provision there is in fact a liquidated damages provision in the event of Mr. Ivanov's termination or breach of contract in favor of Fitness Elite that would in fact entitle them to liquidated damages, serving both the, serving the liquidated damages purpose. Additionally, I'd like to talk about the fact that the, the fact that the District Court rewrote the contract, effectively minutes before we were scheduled to give our closing arguments, to imply Wendell, Idaho as a term of the contract that the jury had to infer despite the fact there being testimony and plenty of evidence that it was explicitly excluded and agreed to for a reason, that the parties did not want to include it and it was agreed to by the parties that Wendell, Idaho would not be included. And finally, I think it kind of hammers the point home that effectively there was a new contract made for the parties by the District Court based on the fact that we were not entitled to present a waiver argument despite it being included within the plain and unambiguous language of the agreement. We asked for it on several occasions and we just simply were not given it. So to start off, and I know that there's been plenty of ink spilled over the liquidated damages provision, but I think it's important because it turns what is effectively a contract the parties agreed to that at the time, based on the future damages, the future salary left remaining on the contract, the amount of damage is in question. The only amount the jury was entitled to decide was $660,000. By rewriting this contract and turning it into a severance pay provision, despite those words not appearing anywhere in there, it turned this into a $2 million case and something that the jury had no clue about, something the jury was not entitled to see. In fact, something that we asked for when on summary judgment after we, I mean, just, I guess I will take this in two points. First off, we believe the District Court's ruling should be overturned and reversed based on the fact that the Moore case unambiguously, unequivocally, black letter law states the Idaho Wage Claim Act does not apply to liquidated damages provisions. All the case law that's been cited by the parties, this is the only case that deals with a liquidated damage provision. Every other one deals with provisions that dealt with severance pay specifically or as agreed to by the parties. Isn't it significant that in both Huber and this case, the liquidated damages provision provided for a lower payout if substitute employment was found? So it, that makes it sound like the liquidated damages here are a bit more like wages. Your Honor, I don't believe it is because if you look at the Moore case or also the definition that we cited to, under the liquidated damages definition, liquidated damages are in turn, are, the purpose they're supposed to serve is when there's a breach of contract, you are entitled to a certain amount of damages entitled to the parties, and it's supposed to reflect some close to what would have been the damages actually suffered. So a liquidated damages provision can include such a term. And the fact that it's, the fact that Huber included a similar term but was a severance provision doesn't render this liquidated damages clause automatically a severance provision. And the fact is, I mean, as lawyers, and the fact is a lawyer drafted this agreement, we know that severance pay and liquidated damages are different things. They are, they have different words and different meanings. And under Idaho law, under, I mean, all laws as far as I know, but what matters here is Idaho law, courts need to apply, interpret and apply contracts according to their plain, unambiguous and ordinary sense. Under the plain, unambiguous and ordinary sense of the words, liquidated damages were written here. They were agreed to. And plaintiff's appellee's counsel relies on the fact that this was negotiated. That further supports this fact. They didn't scratch it out and say this was severance. The term liquidated damages was agreed to and was specifically, was specifically signed and to and asked on the stand was agreed to by Mr. Ivanoff and was agreed to by Fitness Elite. By then saying, well, no, I mean, I mean, that was the intent of the party. It was testified to. By saying, no, this is severance, the court is effectively not only rewriting, it's ignoring the intent of the parties, which is unquestionably inappropriate and inappropriate under Idaho law. And I mean, I think it's also important, and I know we've discussed this as well, but in all the other cases relied upon severance, the severance pay was something that was earned over time throughout the course of the employment. Here, in effect, what we had was a wasting clause almost or a wasting provision, whereas the liquidated damages were based on if he was going to be terminated, if he was terminated without cause a month before he was scheduled to leave, that would have been what he was left with. It was, since it was whatever the amount was, about five years, it was determined based on the amount of time left on his contract, which is precisely what liquidated damages serve. It is supposed to be an amount based on a breach that somewhat exemplifies what would have been the damages suffered. And so, your honors, I mean, I would be happy to answer more questions about this, but I think that there is no question here that this should be reversed just based on the plain language of the contract and based on the plain language of the Idaho statute, which specifically says that its wages are for services rendered, past tense, as well as the Moore case, which is reiterated by the Huber case, as well as the Savage case as good law, remaining law, and binding law. And if that weren't to be accepted by this Court, there still is the fact that, okay, if the Court then found, which I believe it did despite neither party arguing that there was ambiguity here, even if the Court were able to find that there was ambiguity, then this matter needed to be submitted to the trier of fact. That also was black-letter law under Idaho, under Idaho law. And it wasn't. And we did request it. We specifically asked, I mean, after the summary judgment decision, when it was, okay, I guess the district court, you're not going to grant our summary judgment decision, we requested a jury instruction saying, okay, well, if we need to decide whether liquidated damages in this contract is ambiguous and if it means severance pay or means something else under the Idaho Wage Claim Act, let's submit it and ask for a jury instruction. The Court denied that as well. So, even if the Court were not to decide, this is the second part of my, I'm finally getting to the second part of my inquiry, were it to get to that bar and find that the Court somehow appropriately determined there was ambiguity, it still then needed to be submitted to the jury. And the fact is that it wasn't, that was improper, and it should be reversed for that reason as well. And so, turning from that, I think that I just really want to lastly hammer on the fact that Idaho law, I mean, we've cited in the cases that we talked about liquidated damages, but also in the Chauver versus Huckleberry case, which we cite in our briefing, I mean, where there is no ambiguity in a contract, it needs to be applied according to the plain, unambiguous language. And liquidated damages being in the contract is plain and unambiguous as it gets, and somehow this was worked around and the words were worked around, and I believe there's been a case that labels aren't controlling. Well, if labels aren't controlling, but plain and unambiguous language is, and the plain and unambiguous language here is this was a liquidated damages clause, and it was worked around so that the Idaho Wage Claim Act could apply, and the fact is it does not under black letter Idaho law. So, moving on to the second issue I want to talk about is the, again, rewriting of the contract, where, again, we had in the agreement agreed to by the parties that Mr. Ivanoff was an employee of Fitness Elite, and he was to serve as an employee of Fitness Elite. There was no location in the contract. There was no location specified. It was specified during trial, and Mr. Ivanoff was examined on this. Mr. Mauger was examined on this. Was there any location put in there? And the answer was no, and there was a reason for this. They talked about that they wanted to, the ultimate idea was to expand the business, to move it outside. I mean, these clubs, the goal is that you want them to expand outside of state lines. You want to get clubs in other areas. You don't include a location because your duties can take you to places, and did in fact take Mr. Ivanoff to places other than Idaho, outside of Idaho, including Utah, on multiple occasions. But does that make a difference because the district court let the jury decide whether Mr. Ivanoff's duties were elsewhere, right? So, I mean, ultimately, you know, whether the actual physical location was in Idaho, does that really matter given they let the jury decide that one? Sorry, I did not mean to cut you off, Your Honor. It does because, in effect, I think it's a distinction, I mean, that ultimately is extremely harmful error because it tells, it places, by putting a jury instruction in front of the jury that says, you are to imply that Wendell, Idaho, is the place of fitness elite and that is where his duties are to be performed. Yes, they could be entitled to find, okay, he could be told to go to Utah, but it effectively, A, rewrites the contract, and B, places undue importance on a term that the parties never agreed to. And the fact is the parties never agreed to this term and never agreed to Wendell, Idaho, being the place of performance for this very reason, because Mr. Ivanoff and because fitness elite wanted to reserve the right to place him in different locations. Are wrestling seasons the same from location to location? Wrestling seasons, I believe, are different from club, depending on club and depending on collegiate. Mr. Mauger would be the, and Ms. Mauger would be the more experts on this, but I believe they do change. So if they change from place to place, then I'm wondering why that and the fact that the contract requires in-person interactions doesn't make some location an essential term of the I mean, the contract refers to a wrestling season, and how would an employee know what season it's referring to if the contract doesn't have any location attached to it? Well, no, I don't believe it would refer to an essential, it would make it an essential term because it would, by leaving it out, that enables fitness elite who wanted to preserve the right to move Mr. Ivanoff wherever, to have him travel as part of his duties under the contract. It made it essential to leave it out for that reason because it's up in the air. Were there to be other locations, they hadn't obviously determined if there was to be a specific location or where. But the contract says that something, the parties agree to meet and formally discuss all aspects of the operation of the program within 30 days following the conclusion of each wrestling season. I mean, doesn't that have to be some place? That doesn't make sense to have a requirement that they meet within 30 days of wrestling seasons in five different states or locations, does it? Well, no, Your Honor. I mean, I believe that by the terms of that contract, they can meet wherever. That doesn't mean that it needs to be in Wendell, Idaho. That means that they can just meet, they can meet between each other, and that they can determine where they have to meet and decide those. I don't believe that that means that there needs to be a location specified within a contract. I mean, and particularly when the parties specified that they didn't and that they left a location out specifically for that reason to enable this to happen. And I mean, an analogy was given at trial with Mr. Ivanoff's son, Georgie Ivanoff, who had two locations, two different locations across state lines, both in Nebraska and Iowa, and that if, under this interpretation, if you were to say it needs to be in Wendell, Idaho, or there if it was, it needs to be in Nebraska, Idaho, in effect precluding him from crossing state lines. And putting all of this aside, the fact that the court decided this, effectively, again, rewriting the contract rather than submitting it to the jury, who was to have the case submitted to it within, I mean, a matter of minutes. We had closing arguments yet to go. This ruling was made five minutes before we were scheduled to give closing, and then it was to given, and then it was to be submitted to the jury. The fact that it was minutes before was also erroneous, and I would say that under Idaho law, based on the fact that ambiguities in contracts are supposed to be required to be determined by the trier fact, it was also erroneous not to submit that to the jury as well. Lastly, I want to just briefly turn to the waiver argument, because I think it kind of underscores the issues that we have here, that the court was, the district court was effectively kind of ignoring, not kind of, it was ignoring the plain language of the contract, because here, and as we put in our reply brief, we had a waiver provision that specifically excluded any and all other damages other than liquidated damages, again, emphasizing that liquidated damages were the damages in the contract, and I won't get into, again, we had the special verdict for them and the jury instructions, et cetera, et cetera. But the court then refused to allow us to have a waiver jury instruction, despite the fact that there was an unambiguous provision enabling us to do so, and the plaintiff was claiming additional damages in addition to the liquidated damages clause. The court indicated that it was allowing us to make the argument that, okay, well, there's a waiver provision in the contract, but it wasn't giving the jury any instructions on the law that that had any significance. So we could argue until I had no breath left, but it really made no significant difference, as the jury had nothing to go on and no jury instruction to indicate what that significance was, and it wasn't harmless error, as I believe was indicated and argued in the Pele's brief, because although, whether it was $412 or $400,000, the fact is they awarded damages as a result of that, and we weren't entitled to make that damages, and under the application of the law, that waiver provision should apply and should have prohibited those damages from even being sought, which was a motion we made as well. So what we have here, and I'm going to try and get to the point where I've preserved my time, but we have three distinct instances of the court having plain language under the agreement that the parties did not dispute, they agreed to, that was plain and unambiguous in their terms, and then the court effectively rewrote or ignored the contract and didn't apply it according to its plain and ambiguous terms. And for those reasons, Idaho law mandates reversal as Idaho law is clear that these contracts need to be applied according to their plain, unambiguous and ordinary sense. On the other issues, I'll submit it on our briefing, and I'll reserve my remaining time for rebuttal, unless you have any questions for me right now. Thank you, Your Honors. May it please the Court. Counsel, my name is John Howell. I'm from Boise, Idaho, and I represent the appellee, Yvonne Delchiff Ivanoff. The primary issue, as I understand it in this appeal, has to do with the district court's determination that the damages awarded by the jury under Section 6B were wages under the Idaho Wage Claim Act. And this is not an appeal with respect to whether the termination was with or without cause. They didn't appeal that aspect. They're focusing on the wage decision that Judge Dale made. Now, I think the Court got it right, obviously, and I would summarize it by highlighting four items. One, it represented bargain for compensation. And I'm going to get into that a little bit with respect to the details and the argument that the judge, the district court wrongfully reviewed extrinsic evidence in making her decision on summary judgment in just a moment. But number two, the payment was akin to severance pay. Why? Because it served as a salary substitute to protect the economic well-being of Yvonne, my client. Number three, it was not a mere gratuity. And number four, it was not future wages. And I'll go through those in just a moment. With respect to the background of the first item there, with respect to bargain for compensation, I think it's very important. I'm not going to bore this Court with all the details of the history. I think it's an interesting story, especially for parents with kids who pursue sports or debate or whatever it may be. But very briefly, my client, as a younger man, was a world-class wrestler. And after his wrestling days, became a world-class coach. He moved to Boise in 2010. A friend of his from Bulgaria started a wrestling club in Boise named Suplice. His name was Yvonne Radnif Ivanov, just a different middle name than my client. Now, the Moggers lived in or live in Wendell, Idaho. That's a small town in Idaho about a hundred miles southeast of Boise. They have three kids, two boys. They got into wrestling. They began driving over to Idaho or to Boise in about 2011, three to four times a week to get world-class coaching at Suplice. In 2013, Appellant Fitness Elite was created and they started a gym in Wendell. So instead of driving over to Boise, they paid Suplice $150,000 to bring the coaches to Wendell. And they formed a relationship with my client, Yvonne. In 2015, there was a dispute arose between Mr. Mogger and Radnif. And as a result, Mr. Mogger asked my client to be the head coach. So this is the critical time period with respect to the bargain for compensation discussion in the October and November of 2015 time period. We know that there were discussions with respect to the agreement and specifically Section 6B. That's Exhibit 202 at trial. It's in the ninth volume of excerpts of record. And there's handwriting that's scratched in that agreement. The parties discussed this. Why? Two primary reasons. One is that my client wanted to make sure that he had economic stability in taking this job. He had talked to Radnif about taking the job. Predictably, he got extremely upset, asked my client to sign a non-compete. And Mr. Mogger then sent my client the draft agreement that his attorney created. There were discussions between my client and Mr. Mogger. And my client's son, Georgie, also participated in those. And the result was what we have in the actual agreement, Exhibit 101, that in Section 6B, there is this payment for the life of the contract. If we terminate you without cause, you'll be paid the remainder. And so the part that's ‑‑ Can you discuss and distinguish the Moore v. Omni care case? Because I think that's the most factional analogous. And if I ‑‑ maybe I missed it, but I don't think your answering brief addressed that case. And I think that's the most relevant one. Sure. Yeah. Absolutely. And in Moore, Moore deals with ‑‑ I mean, obviously we know what Moore deals with. It dealt with liquidated damages. And this case involves liquidated damages. Sure, Your Honor. What Moore doesn't do is it doesn't provide us a real good roadmap with respect to how to handle these cases. Moore was an appeal from an arbitration panel's award and decision with respect to Mr. Moore. It was a ‑‑ or it wasn't appeal. It was ‑‑ there was a motion to modify or vacate that award. It went to the lower court in Idaho. Judge Copsey, who I used to work for, rendered the decision on that. And the primary issue in that case, and I'll get to my point here in a second, but the primary issue had to do with whether the Federal Arbitration Act applied or the Idaho Uniform Arbitration Act applied. And that's important here because it wasn't a de novo review. So that's why I think the court in Moore doesn't deal with the ‑‑ was this ‑‑ you know, doesn't deal with the party's intent and was it bargained for compensation. Judge Dale addresses this in her memorandum for ‑‑ on the decision for the reconsideration post‑trial. I think she does a nice job outlining this discussion. But what Moore does is it tells us that future wages are not wages under the Act. That's the takeaway from that. Okay? It doesn't go into any analysis with respect to ‑‑ with respect for ‑‑ with respect to bargain for compensation. And it doesn't ‑‑ what it also doesn't do is it doesn't give us any discussion as to what the party's intent was. Now, what we have after that 2005 Supreme Court decision is we have several other decisions that are right on point from the Idaho Supreme Court. Huber, I think, is right on point. Well, I'm not ‑‑ I'm not sure that it ‑‑ that it is. I mean, there the court talks about the relevant contractual provision as being severance pay, not liquidated damages. It seems like something like severance pay would naturally increase rather than decrease with the length of employment. And it also seems unusual that something like a severance pay agreement would be mutual, which the provision is here. I mean, your client would have had to pay Fitness Elite if he had decided to terminate his employment early. And I ‑‑ it just seems like it would be a very unusual severance pay provision to me. But go ahead. Sure. Sure. I think it is on point, Your Honor, because Section 3.2.2, I believe, from the Huber agreement is strikingly similar to our agreement here. They both talk about if there's a termination without cause, you'll be paid a certain amount afterwards. And that, as Your Honor noted in the question to counsel earlier, both provisions have a ‑‑ reduce the amount that the employer owes or would owe if the employee goes out and gets additional work. And so that number is reduced. And the Huber court thought that that was extremely important. And what happens now is that in Huber, you know, it's ‑‑ the court says this is like or this seems like a severance pay provision. In severance pay, the intent of the severance pay is to protect the employee, to protect them from economic harm. And in Huber, the court found that that provision protected Mr. Huber from economic harm that he would have while unemployed. It's the same thing here. Now in Huber, the payment, the severance payment was just flat amount, right, no matter the timing, whereas here, the amount decreases as Mr. Ivanoff worked longer for the mogger. That's right. And I think it's important on that aspect, Your Honor, that the contract here, section 1 and section 6C, both talk about how important it is to both parties to have a long-term agreement. And it was super important to my client moving from Boise and giving up, you know, burning the bridge with Radniff. It was also important to Fitness Elite to have a long-term agreement that specifies that in section 1. And in section C, they even say, the contract even says, section 6C, excuse me, that the only reason Fitness Elite, or part of the reason, the big reason, is that they're entering into this decision to hire him based upon the long-term commitment that the coach has given. So, you know, the long-term commitment here was super important. We knew that that was going to be the purpose, is to have a long-term commitment. Fitness Elite indicated in the testimony, indicated at the trial, that they wanted coach to be there for a long time. Right? So I think back to the severance pay provision. Is this severance pay? This is more akin to severance pay. I'm not sure that it fits into some sort of, you know, black letter defined box of what severance pay is. But as the courts indicate, it is, you look at the intention of the parties, and is it bargain for compensation? And what is severance pay? It's to protect the employee from economic hardship. And that's exactly what this was. That's exactly what this did. And I think the Huber case is spot on on that, respectfully. And I don't think that Moore is spot on because it doesn't get into the analysis that all the other courts that have applied or looked at this issue do with respect for bargain for compensation. And the other thing that I'll add with respect to Moore, they call it future wages. We learned from the following cases from the Idaho Supreme Court, Nettleton, Savage, Huber also, that in order for something to be a future wage, there has to be something more for the employee to do. And if that's the case, then it's not going to be wages. If there's nothing more for the employee to do, then it's wages. And that context comes up regularly in the, for commissions. You know, was the commission earned or not? And that's where the court, the Idaho Supreme Court, has unequivocally, in my mind, indicated that, look, if there's nothing more for the employee to do, then it's not a future wage. That's what Judge Dale held in this case. There was nothing more for Yvonne to do. It could not be a future wage, which is dissimilar to Moore. With respect to, oh, extrinsic evidence, real quickly, the argument is that the court erred in reviewing, or as soon as there's an ambiguity, it automatically goes to the trier of fact. And they point out an Idaho Supreme Court case. I think, you know, Judge Dale and her decision on the summary judgment back in November 17, 2022, addressed this and identified Idaho law, starting with a 1917 Idaho Supreme Court case called Snodderley, where if there's an exception to that rule, that if there's a latent ambiguity in a contract, the court can consider extrinsic evidence. I pointed out in our answering brief, excuse me, that there's Ninth Circuit. This circuit has a similar carve out on a motion for summary judgment. There's no hard and fast rule that a court cannot consider extrinsic evidence when there's an ambiguity in a contract, and that was a San Diego Gas and Electric case and others. So I think it was appropriate, whether you apply federal, the reason why we cited that, I wasn't quite sure if there was going to be an argument made as to whether it's federal procedural or whether this was a procedural question or substantive question, but under both federal and Idaho law, I think it's appropriate for the court to consider extrinsic evidence in this context. And when you do that, that's when it becomes clear that it's bargained for compensation. Moving on to the two other items that counsel addressed, and the first is this location of the school. I would, I was, I mean, I'll tell you, we moved for a directed verdict at the close of evidence or the evening before, yeah, at the close of our case, asking for two things, the location of the school and that the duties should be primarily performed in Wendell, those two items. I lost on the second one. I want us to do the location of school or the judge agreed with me, Judge Dale. And this appeal, it seemed like they're appealing something that they actually, there was no issue on. I mean, the court clearly indicated that where the location of the duties were to be performed was going to be a jury question. So I don't think the court did anything wrong. I think the court got it right. She certainly had the ability to imply a term where there was no disputed fact whatsoever. And that was, that was what happened there. And again, she denied our motion with respect to the location of the duties, indicating that that was for the jury to determine. And the jury ultimately found that, as we know, the termination was without cause. On the waiver argument, the failure to give a jury instruction on waiver, in order to establish a defensive waiver, you have to prove reliance and that a party altered its position. And I would submit there was no evidence whatsoever presented on that issue, which is why the court didn't give the jury instruction. The contract talks about waiver. She indicated to counsel, you can argue that. You can argue waiver if you want. But they hadn't established waiver from the true sense of waiver as an affirmative defense, which is, again, reliance and change of position. Other than that, never expect a cold bench or a hot bench, but those are specifically responding to the other provisions. Can you address one of the evidentiary issues, and that's the court admitted one of the taped recordings of Mr. Mauger saying that he's going to lose millions because of COVID. What is the relevance of admitting that testimony? It seems gratuitous. It seems like that was really intended to show that the Maugers are wealthy. They have deep pockets. I'm not sure what the relevance of that amount. Sure, Your Honor. I think every request that was made to redact portions of the audios were complied with by us. Well, I think there was a colloquy between, I don't know if it was you at the trial level and the judge, but I think the Maugers' attorneys wanted that portion out, I think precisely because they thought it would be prejudicial because you're referring to one party, again, having very deep pockets. If you lose millions in COVID, you probably have a lot more millions that you didn't lose. And I just don't see the relevance of mentioning millions of dollars other than to say, look, these are very, very wealthy people, and they lose, in this case, no big deal. Well, okay. On that specific term, I guess my memory might be failing me a little bit, Your Honor, but what I would, how I would respond, I guess, is that you have, I mean, we bent over backwards with respect to auditing or editing the audios as soon as we could addressing any issues. On that specific issue, depending on what came in, I apologize, if my argument, you know, I do think that there was relevance with respect to the context of the termination, right? We're arguing about whether this was with cause or without cause, and we obviously argued that it was a without cause termination. We knew that the Maugers had, that Coach was their highest paid employee. We knew that their oldest son was going to Utah to wrestle a Division I, and bluntly, Your Honor, we felt that this was a situation where the Maugers found an opportunity to get rid of Coach and to get him off the payroll. And so that went into the narrative of the reasons for the termination, which had nothing to do with a for-cause termination. It did not have anything to do, or the intent was, with respect to the deep pockets of the Maugers. It had to do with the financial situation that they may have found themselves in with respect to COVID and wanting to jettison a salary. But wasn't the main issue whether he has to move to Utah or not under the contract? April 22nd letter in 2020 is the justification that Mr. Mauger gave for the termination during the audio recordings. In this litigation, they brought up all sorts of different things and attacked my client from the standpoint of saying that he abused children, he was a terrible coach, etc. But it seemed like the thrust of the trial was, does he have to go to Utah or not? I mean, all the facts leading up to it, there's counter-offers, demand for more money, housing, etc. He has to move to Utah. It seems like that was really the thrust of the trial, not whatever, you know, he lost money during COVID, lost millions in COVID, and therefore wanted to cut costs. Yeah. I mean, I don't know what Mr. Mauger was not thinking, but that was the justification that they utilized in order to terminate him, which then circles back to the terms of the contract and whether my client felt like, again, that he was being pushed out and that he couldn't comply with the contract. If he was to go to Utah, he still had a contract that says that he had to coach the kids at Fitness Elite. And there was lots of other students at Fitness Elite that he was responsible for coaching. So the purpose of that April 22nd letter was, I mean, the testimony was, hey, I'm trying to get his attention. I'm trying to see what the heck is going on here because I don't think under this contract I can go down to Utah because I have other obligations. Can I ask one follow-up question? So in this case, if I understand correctly, the liquidated damages provision, he gets the remainder of his salary times the years. What would be paid out? But he doesn't get it if he gets alternative employment, right? It gets reduced by alternative employment. That's right. So I'm just trying to get a 10-year period here, right? Yes. So let's say in three months in, he gets let go. I mean, is the thought that he would just sit there and twiddle his thumbs for nine plus years? So I'm trying to figure out, because part of the way you compare this case to Hoover and say it's not like Moore is because it's more like Hoover in that, if I'm getting the names of the cases right, it's more like Hoover in that sense. But as a practical matter, it's hard to see how that provision will work. I mean, for one thing, you come in and say, I want my nine years worth of pay, but then once you get it, then you can't work for nine years or they can clob back? Or, I mean, how does that even work? I'm trying to figure out. Yeah. I think the contract addresses that with respect to, to the extent there's a future, to the extent you get future employment, there is a repay provision in there. But it's actually encouraging somebody to not work for, because if you had nine years left, you'd basically, well, I could go work as a coach, but if I do, I'll have to pay all this money back. Yeah. I mean, I mean, Your Honor, Judge Van Dyke, I mean, I think, I mean, those aren't the facts, number one. And I don't mean to not discuss it with you, but the reason I get it, but like, it does seem like this, the fact that this liquidated damages provision is like Moore, in a sense that it provides for a lower payout. If it turns out that that provision has, it is just practically almost irrelevant because I assume that it doesn't sound like this is the kind of guy that's going to sit around and twiddle his thumbs. No, not at all. That's right. In other words, it's kind of a low risk to put in there, for the other party to put in there, that we have to pay your salary as long as you have this other term that we don't have to pay to you to get another job, because he's going to get another job. That's right. And under Section 1 and Section 60, I mean, it was critical for Fitness Elite to have this long-term commitment. They believed that they were going to honor it the entire time, too. And the only time that they wouldn't honor it is if they terminated them without cause. So, I mean, I think. Okay. That is a strange provision. Thank you. Appreciate it. Thank you. Thank you, Your Honors. I will try and be brief. Perhaps it's this setting and just where I am that it feels like me wanting to drape the American flag over my shoulders. But words matter. Agreements matter. The facts are, in this case, Mr. Ivanoff, Fitness Elite, they signed a contract that said liquidated damages on four separate occasions. There is case law in Idaho that specifically says is the dispositive that liquidated damages, a liquidated damages provision, the Idaho Wage Claim Act, does not apply. How this has gotten turned out and how this result was reached is baffling to me. And I think that Your Honors hit the nail on the head that the cases that have been relied on by the plaintiff and the appellee are completely distinguishable in the fact that, for many reasons, but here the amount goes down over time, whereas in true severance provisions or like the Haas case, for instance, he would be working, he would get $100,000 for each year that he worked. That was money he earned over time for services rendered under the plain language of that statute that fits. Here it goes down over time and it's based on future wages, based on future salary, and it's based on a time that he was not going to be working. He wasn't going to lift a finger to get this money. Under the Idaho Wage Claim Act, it needs to be for services rendered. This wasn't for services rendered. This was the amount agreed upon in the event of a breach of contract that worked both ways, we can't forget, because Fitness Elite had its own liquidated damages provision. And the fact that this has somehow been turned around and the words have been not just twisted, but absolutely changed so that liquidated damages now say severance pay is just, it's not fair. It's not justice. It's not right and it's not what's proper under Idaho law. And so for that, for those reasons and those included in our briefing, we asked the Court to reverse it. I would like to address Judge's point on admitting the evidence about the Maugers' finances. I mean, it was gratuitous. There had already been evidence of, I mean, evidence that had come in of their bank statements. It served nothing but to inflame the passions of the jury. And we objected and we tried to get that out of there and it just, it just did not. The judge overruled us. I will say one more thing. There's been an Idaho case in where a contract that included a liquidated damages clause was found that the Idaho Wage Claim Act applied and that the treble damage or the attorney fee provision applied. The only case that addresses it is Moore and the liquidated damages clause in that provision, the Idaho Wage Claim Act does not apply. The same is true here and should be true here. Thank you. Thank you. Thank you and thank you both for the helpful oral argument. The case has been submitted and we're adjourned for the day.
judges: LEE, VANDYKE, THOMAS